IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 4, 2010

**STATE OF TENNESSEE v. JOSEPH SHAW, JR.**

**Appeal from the Circuit Court for Madison County**
**No. 09-52      Roger A. Page, Judge**

**No. W2009-02326-CCA-R3-CD  - Filed August 27, 2010**

The defendant, Joseph Shaw, Jr., was convicted by a Madison County jury of one count of
rape, a Class B felony, and one count of sexual battery, a Class E felony.  The trial court
merged the sexual battery conviction into the rape conviction and sentenced the defendant
as a Range I offender to eleven years at 100% in the Department of Correction.  On appeal,
the defendant challenges the sufficiency of the evidence and argues that the trial court erred
by admitting a prior consistent statement of the victim without issuing a limiting instruction
and by imposing an excessive sentence.  Following our review, we affirm the judgment of
the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and D. KELLY
THOMAS, JR., JJ., joined.

Magan N. White, Jackson, Tennessee (on appeal); and Paul Edward Meyers, Assistant Public
Defender (at trial), for the appellant, Joseph Shaw, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney
General; James G. (Jerry) Woodall, District Attorney General; and James W. Thompson,
Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

According to the State's proof at trial, on August 30, 2008, the defendant sexually

assaulted his girlfriend's thirteen-year-old daughter, K.P.,[1] grabbing her breasts and buttocks and penetrating her labia with his fingers. He was subsequently charged with one count of rape and one count of sexual battery and tried before a Madison County jury on June 11, 2009.

The victim, who was fourteen years old at the time of trial, testified that late on the morning of August 30, 2008, her mother was at work and she was home alone in their Jackson apartment when the defendant came to the apartment at her mother's request to bring her some food. She said that she admitted him into the apartment and that he ate his lunch at the table while she ate on the couch as she watched television. The victim testified that she had slept late that morning and was dressed in pajamas and wrapped in her cover. She said she was still watching television after she had finished her meal when the defendant got up as if to leave but then knelt down on the floor beside her and started talking.

The victim testified that she could not recall what the defendant said but that after a few minutes she asked him to leave. The defendant said no and kept talking. A few minutes later, she asked him to leave again and he again refused. She then told him to get out, but he instead placed his hand on her thigh. She slapped his hand and moved it away. He kept trying to touch her, and she kept pushing him off. Finally, he walked behind the couch, grabbed the cover that she had tucked under herself, and threw it onto the floor, in the process knocking her to her stomach onto the floor.

At that point, the defendant "started grabbing . . . and touching [her]" as she attempted to fight him off. The victim said that the defendant grabbed her breasts, touched her buttocks, and stuck his hands inside her pajamas and underpants to touch her in her "private parts." She stated that she was screaming and kicking and that the defendant put her mother's shirt, which was lying across the arm of the couch, in her mouth as he told her to stop screaming and that they would both get in trouble. In addition, the defendant told her not to tell her mother and that if she did, he would say that she had been "walking around the house butt [sic] naked in front of him."

The victim testified that the defendant stopped and ran out the door when her cousin called her on her cell phone. She said that she got up and locked the door behind him, retrieved her phone from where it had been knocked under the couch, and called her cousin back. She stated that she did not tell her cousin what had happened because she did not want her family to know. Immediately after that conversation, however, she called her best friend, Shantevious Gillard, broke down crying, and told her what the defendant had done. The victim said that Gillard put her grandmother on the phone, who reacted by calling Gillard's

---

[1] It is the policy of this court to refer to minor victims of sexual assault by their initials only.

mother. Gillard's mother, in turn, reported the incident to the victim's mother.

The victim identified on an anatomical drawing where the defendant had touched her, circling the buttocks, breasts, and pubic areas of the drawing. She testified that as the defendant was touching her privates, "[h]is fingers touched the inside of [her] lips just a little bit." At the request of the prosecutor, she then indicated on a diagram of the female sex organ the precise places the defendant had touched, marking two X's on each labium minus and a "P" beside them to indicate penetration. She also demonstrated on an anatomically correct doll where the defendant had penetrated her with his fingers.

On cross-examination, the victim acknowledged that she did not call 911 or her mother, that she told her cousin that everything was okay, and that none of her neighbors came to check on her, despite the fact that she lived in a second floor apartment and the incident happened in the middle of the day on a Saturday. She testified that she had known the defendant for approximately three years, had been alone with him before, and had never expressed any uneasiness or problems with him in the past. She agreed that she testified at the preliminary hearing that the defendant had not penetrated her but then changed her answer after meeting with someone from the prosecutor's office. After having her memory refreshed by her preliminary hearing testimony, she also acknowledged that just prior to the incident, the defendant had told her that R & B singer Chris Brown, whom she had jokingly claimed as her boyfriend, would not be with her because she was "a big girl." She denied, however, that the defendant's comment made her start fighting with him or caused her to fabricate the allegations against him.

On redirect examination, she testified that she did not call her mother because she knew that she "would be upset and crying and hurt."

Derrick Mays, the victim's cousin, testified that he called to check on the victim on August 30, 2008, after leaving church. As he recalled, the victim told him that her mother was gone and that she was home alone.

Shantevious Gillard testified that the victim called her crying on August 30, 2008, and was initially unable to tell her what was wrong because "she was choking up her words." She said that the victim finally told her what had happened but begged her not to tell anyone because the defendant had told her she would get in trouble. The witness stated that she started crying upon hearing the victim's revelations and that her grandmother, who was in the room with her, got on the phone, assured the victim that they would be right over, and then called the witness's mother, who reported the incident to the victim's mother.

Stacy Gillard, Shantevious' mother, testified that her daughter's grandmother called her on August 30, 2008, to tell her that the victim had reported that the defendant had tried to rape her and that she relayed that information to the victim's mother.

The victim's mother testified that when she received a phone call informing her that the victim had been raped by the defendant she immediately headed home, calling the police, an ambulance, and the defendant en route. She said when she asked the defendant what he had done to the victim, he replied that he had not done anything, that the victim was lying because she did not want them to be together, and that he would meet her at the apartment. When she got home, the defendant was waiting outside and the victim, who was crying and wrapped up in her cover on the floor, told her that the defendant had touched her. The defendant initially said that he had not touched the victim but later admitted that he had touched the victim's breasts and buttocks. She asked him why, but he never gave her an answer.

The victim's mother testified that the victim said at the preliminary hearing that she had not been penetrated because she thought, at the time, that penetration required insertion into the actual vagina. The witness said that she and the victim did not learn otherwise until they were instructed by the prosecutor.

On cross-examination, the witness testified that, although she could not now recall the conversation, she said in her statement to police that the defendant told her that his touching of the victim's breasts and buttocks occurred while they were playing.

Jackson Police Officer Rochelle Staten, who responded to the scene, testified that she interviewed the victim while Officer Isaiah Thompson interviewed the defendant.

Jackson Police Officer Isaiah Thompson testified that the defendant told him that he and the victim had been "wrestling," but the defendant denied having touched the victim's breasts, buttocks, or groin area. He said he asked the defendant if the victim's panties were down, and the defendant stated that "[t]hey might have come down when [they were] tussling" because the victim was kicking at him. He stated that when he asked the defendant to explain why he was "tussling" with the thirteen-year-old victim, the defendant replied that the victim was "kind of tomboyish" and that she did not "even really like [him]."

Investigator Danielle Jones of the Jackson Police Department testified that the victim's account of the crime in the statement she took from her was consistent with the account she provided at trial. On cross-examination, she acknowledged that the victim mentioned nothing in her statement about the Chris Brown exchange or the defendant's having touched her thigh.

The defendant, testifying in his own behalf, provided the following account of the episode. He was about to leave after he and the victim had eaten the food he brought them when the victim, who was watching television, "got to hollering" about Chris Brown, saying that he was her boyfriend. He told her that Brown would not have her because she was "a fat big juju," and the victim became very angry and jumped at him. He and the victim struggled, and he grabbed her arms and threw her down in an effort to prevent her from hitting him. She then tried to kick him below the waist, and he grabbed her legs to stop her. He did not hurt her but did only "enough to get her off [him.]" At that point, the victim got up and started panting as if she were having an asthma attack. She pointed to the door, and he left the apartment, got into his truck, and drove home.

The defendant testified that he might have touched the victim's breasts or buttocks during the struggle but that it was unintentional. He denied that he pulled her panties down, put his hands down her pants, or penetrated her in any way. On cross-examination, he said that if the victim's panties came down, it was not because he pulled them down but because the victim was "kicking and stuff, wiggling."

The State called the victim in rebuttal, who denied that she had attacked the defendant or that the two had engaged in any playful "tussle" or fight.

Following deliberations, the jury convicted the defendant of both counts as charged in the indictment. The trial court merged the sexual battery count into the rape count and, applying the enhancement factor that the defendant abused a position of private trust, sentenced the defendant as a Range I offender to eleven years at 100 percent for the rape conviction, three years beyond the minimum sentence in the range.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant first contends that the evidence was insufficient to sustain his convictions for rape and sexual battery. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, rape is defined as "unlawful sexual penetration of a victim by the defendant" accomplished with "force or coercion." Tenn. Code Ann. § 39-13-503(a)(1) (2006). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or *any other intrusion, however slight*, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." Id. § 39-13-501(7) (emphasis added). As our supreme court has explained, "'sexual penetration in a legal sense'" occurs "'if there is the slightest penetration of the sexual organ of the female . . . . It is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient.'" State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting Hart v. State, 21 S.W.3d 901, 905 (Tenn. 2000)).

"Sexual battery" is defined as "unlawful sexual contact with a victim by the defendant" accomplished with "force or coercion." Id. 39-13-505(a)(1). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Id. § 39-13-501(6).

The defendant argues that the evidence was insufficient to show beyond a reasonable doubt that he sexually penetrated the victim or that he intentionally touched her in any sexual manner. In support, he cites his testimony that he and the victim were involved in a struggle after she attacked him when he called her fat, as well as the victim's admissions that she did not call 911 or her mother, told her cousin that nothing was wrong, and testified at the preliminary hearing that she had not been penetrated. The State responds by arguing that the jury accredited the victim's testimony over that of the defendant, as was within its province.

We conclude that the evidence, viewed in the light most favorable to the State, established that the defendant, using force, intentionally touched the victim's breasts, buttocks, and pubic region for the purpose of sexual arousal or gratification and that his touching of her pubic region occurred under her clothing and included the penetration of her labia with his fingers. The victim provided great detail about the assault, relating how the defendant first made sexual advances, which she refused, and then physically attacked her by throwing her on the ground, groping her breasts and buttocks, and putting his hand inside her pajamas and underpants to penetrate her labia with his fingers. The victim explained that she changed her testimony with respect to whether she had been penetrated after receiving instruction from the prosecutor on what constituted penetration. She also demonstrated on both a diagram and an anatomically correct doll exactly where the defendant had touched her vulva. In sum, the victim's testimony, which was obviously accredited by the jury, was more than sufficient to sustain the defendant's convictions for rape and sexual battery.

## II. Admission of Prior Consistent Statement

The defendant next contends that the trial court erred by allowing Investigator Danielle Jones to testify about the victim's prior consistent statement without instructing the jury that such statement could not be considered as substantive evidence but only in assessing the victim's credibility. The State argues, alternatively, that the defendant has waived the issue by his failure to request the limiting instruction at trial and that any error in admitting the evidence without a specific limiting instruction was harmless, particularly in light of the fact that the trial court issued the appropriate limiting instruction with respect to the use of a prior inconsistent statement. We will trace how this matter developed at trial.

In the defense's cross-examination of the victim, she was questioned at length about how her testimony at the preliminary hearing[2] differed from her testimony at trial. She acknowledged that, at the preliminary hearing, she did not say that the defendant had touched her thigh or that he had penetrated her. The trial court sustained the State's objection to the

---

[2]The record on appeal does not contain a transcript of the preliminary hearing or the victim's statement to Danielle Jones of the Jackson Police Department.

defendant's question, "Is there any reason why your story keeps changing every time you meet with the investigators?"

Later in the trial, Danielle Jones, who investigated the victim's complaint for the Jackson Police Department, was called as a witness for the State. She said the victim told her that she had awakened at about 11:30 a.m. and that the defendant had brought food for her and left briefly to get a drink. The defendant objected to this line of questioning, but the court overruled the objection, concluding that the State was asking about prior consistent statements of the victim. Officer Jones said that the victim had said in her statement, as she had testified in court, that she was wearing pajama top and pants; that the defendant said he was leaving but returned, got on his knees on the floor, and began talking with her; that he threw her cover to the floor, knocking her to the floor; that he rubbed her vaginal area, buttocks, and breasts; that she was kicking and screaming and he told her to stop or both would get in trouble; that the defendant put a white shirt around her mouth; that her cell phone began ringing but had fallen under the couch; that the defendant left as the telephone began to ring; that the telephone call was from her cousin, Derrick, with whom she talked; and that she told her friend, Shantevious Gillard, what the defendant had done.

So, in a nutshell, what occurred at trial as to this matter, is that after the victim testified, the defense cross-examined her as to differences between her testimony at trial and the preliminary hearing, establishing that she had not earlier testified that the defendant had penetrated her. On redirect examination, the State questioned her as to the contents of her statement to police officers. That statement appears to have been consistent with her testimony at trial, except that she did not tell Investigator Jones that the defendant had penetrated her.

Evidence of a witness's prior consistent statement may be admitted when, as here, the witness's credibility has been impeached through the introduction of a prior inconsistent statement that suggests that the witness's "trial testimony was either fabricated or based upon faulty recollection." State v. Meeks, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993). "Under such circumstances, the [witness's] statement made before the inconsistent statement but which was consistent with [the witness's] trial testimony" is admissible to rehabilitate the witness's credibility. Id. The prior consistent statement is not offered for the truth of the matter asserted, and it is proper for the trial court to issue a limiting instruction to the jury to that effect. See State v. Livingston, 907 S.W.2d 392, 398 (Tenn. 1995); State v. Braggs, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980).

Although the defendant objected to the introduction of evidence of the victim's prior consistent statement on the grounds of hearsay, he did not request that the trial court issue a limiting instruction upon the admission of the evidence. Generally, a failure to request such

an instruction results in waiver of the issue on appeal. See Tenn. R. Evid. 105; State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000) ("A trial court . . . generally has no duty to exclude evidence or provide a limiting instruction to the jury in the absence of a timely objection."). Thus, we agree with the State that the defendant has waived this issue by his failure to request the instruction at trial.

The defendant argues that "[s]imilar to the case of the admission of a prior inconsistent statement for impeachment purposes, a limiting instruction should be given in the case of the admission of a prior consistent statement, even when not requested, if the State's proof is weak and the prior statement is damaging." The State points out that the trial court issued the appropriate limiting instruction on the use of prior inconsistent statements and asserts that "no court has found that both instructions should be given absent any special request." We agree with the State.

In State v. Thomas Dee Huskey, No. E1999-00483-CCA-R3-CD, 2002 WL 1400059, at *156-57, (Tenn. Crim. App. June 28, 2002), perm. to appeal denied (Tenn. Feb. 18, 2003), which is cited by the defendant in support of his argument, we did not hold that a limiting instruction should be issued, regardless of request, whenever a damaging prior consistent statement is admitted for impeachment purposes and the State's case is weak. Rather, after noting the principle as it applies to prior inconsistent statements, we concluded that "[e]ven if, for argument's sake, we were to apply that principle to the present circumstance, it would avail the defendant nothing," as the State's case was not weak and the prior consistent statement was not very damaging. Id. at *176. In this case, likewise, the State's proof was far from weak, as the victim's testimony was strong and unwavering and was bolstered by her friend's and her mother's description of her emotional distress immediately following the attack. Furthermore, the evidence presented of the victim's prior consistent statement was not that damaging, for, in the statement, the victim did not say that the defendant had penetrated her.

In a reply brief, the defendant asserts that a limiting instruction is a specific requirement for the admission of a prior consistent statement and that the trial court's failure to issue one constitutes plain error. We respectfully disagree. In order for us to find plain error, "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established.

Id. at 283.

The prerequisites for a finding of plain error are not met in this case, as no clear and unequivocal rule of law was breached and consideration of the error is unnecessary to do substantial justice. Although a limiting instruction should be issued, it is not, as we discussed above, an absolute requirement for the admission of a prior consistent statement in the absence of a defendant's request. Moreover, even if the trial court erred in allowing the State to question the victim about her statement to police officers, the error was harmless. Earlier in the trial, the jury had heard the testimony of the victim's friend, Shantevious Gillard, who said that the victim had called her on August 30, 2008, crying and "choking up her words." Gillard's grandmother then spoke with the victim and, afterwards, telephoned Gillard's mother, saying that the defendant had tried to rape the victim. When the victim's mother arrived at her residence, the defendant was waiting outside. The victim was inside, crying and wrapped up in a blanket, and told her mother that the defendant had "touched" her. The defendant later admitted to the victim's mother that he had touched the victim's breasts and buttocks and did not respond when asked why he had done so. Additionally, without objection, the victim's mother testified that, at the preliminary hearing, the victim did not testify that the defendant had raped her because the victim believed that rape required penetration of the vagina. Given all of this testimony, particularly as to the emotional state of the victim and the admission of the defendant to the victim's mother that he had touched the victim's breasts and buttocks, we conclude that, even if the trial court erred in this evidentiary ruling, the error was harmless.

### III. Excessive Sentence

Lastly, the defendant contends that the trial court imposed an excessive sentence by improperly applying the enhancement factor of his abuse of a position of private trust. Specifically, he argues that the factor should not have been applied because he did not share the same household with the victim, and there was "no evidence as to what interactions between [the victim] and [the defendant] led [to the victim's] trusting [the defendant.]" The State argues that the trial court's application of the enhancement factor was proper, as "the defendant would not have been able to rape and sexually abuse this child, had he not been her mother's boyfriend and had he not been entrusted in that capacity to take her lunch on the day the offense occurred." We agree with the State.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and

circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

At the sentencing hearing, the victim's mother testified that the defendant's actions had devastated both the victim and herself and that they both attended counseling as a result. She said that she had placed complete trust in the defendant, who had "always appeared to be like a father figure" to the victim, but that she now no longer trusted any man. She further testified that the victim's personality had completely changed, in that she was quieter, no longer liked to attend church or be around other people, and in general preferred to keep to herself.

In his allocution to the court, the defendant denied that he raped or improperly touched the victim, protesting that it was "more like a case of assault and battery because [the victim] got aggressive and tried to hit" him.

At the conclusion of the hearing, the trial court rejected the State's proposed enhancement factor that the victim was particularly vulnerable due to her age, see Tenn. Code Ann. § 40-35-114(4) (2006), but found that enhancement factor (14), the defendant abused a position of private trust, see id. § 40-35-114(14), applied and was entitled to great weight due to evidence that the defendant had used his romantic relationship with the victim's mother to gain access to the victim. The court's ruling states in pertinent part:

> Now, as to the other one, number fourteen, it deals with a position of private trust. The [d]efendant abused a position of private trust that significantly facilitated the commission or the fulfillment of the offense. I'm finding by a preponderance of the evidence from . . . what I heard during the sentencing hearing and also at trial that [the defendant] was the boyfriend of this victim's mother, which gave him accessibility to the victim. It also gave him an opportunity to commit this crime that others would not have had.

> Most of the cases dealing with this deal with parents, stepparents, teachers, that sort of thing. But the Court can make a finding that there was a position of trust here.

> In the case of State v. [Larry E.] Rathbone, [No. E2007-00602-CCA-R3-CD, 2008 WL 1744581 (Tenn. Crim. App. Apr. 16, 2008), perm. to appeal denied (Tenn. Oct. 27, 2008)], the Court was upheld in applying the factor to the father's girlfriend . . . . And even on that case it was a live-in girlfriend.

> I think here because of the damage to the victim . . . and the impact on her, I think the Court is going to find for that reason, along with all the others, the [d]efendant was in a relationship with the victim that promoted confidence, reliability, and faith.

We find no error in the trial court's application of this factor. Although our supreme court has held that an adult "occupies a position of 'presumptive private trust' with respect to the minor" when the adult and child are members of the same household, there is no requirement that a defendant share the same household with the victim, or occupy any formal relationship with respect to the family, in order for enhancement factor (14) to apply. State v. Gutierrez, 5 S.W.3d 641, 645 (Tenn. 1999). As the Gutierrez court explained:

> [T]o determine the application of the private trust factor, the court must look to "the nature of the relationship," and whether that relationship "promoted confidence, reliability, or faith." State v. Kissinger, 922 S.W.2d [482,] 488 [(Tenn. 1996)]. A relationship which promotes confidence, reliability, or faith,

usually includes a degree of vulnerability.  It is the exploitation of this vulnerability to achieve criminal purposes which is deemed more blameworthy and thus justifies application of the enhancement factor. . . . As with all determinations regarding the application of an enhancement factor, the utilization of this analysis "is a task that must be undertaken on a case-by-case basis." [State v.] Poole, 945 S.W.2d [93,] 96 [(Tenn. 1997)].

Id. at 646.

The defendant, whom the victim had known for approximately three years at the time of the offense, was the boyfriend of the victim's mother and, according to the mother's testimony, acted as a sort of father figure to the victim.  As such, he was entrusted to bring the victim her lunch and to dine alone with her at the apartment while the victim's mother was at work.  The defendant exploited that trust and the vulnerability of the thirteen-year-old victim by not only sexually assaulting her but also threatening that if she reported the abuse, he would claim that she had engaged in exhibitionist behavior in front of him.  Given his close relationship with her mother, the defendant was also no doubt aware that the victim would be reluctant to report the abuse to her mother for fear of upsetting her.  Under these circumstances, we conclude that the trial court properly enhanced the defendant's sentence based on the application of enhancement factor (14).

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE